# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **JOSEPH CAIMONA,** | **CASE NO. 4:18-CV-00785** |
| **Plaintiff,** | |
| **-vs-** | **JUDGE PAMELA A. BARKER** |
| **OHIO CIVIL SERVICE EMPLOYEES ASSOCIATION, et al.,** | **MEMORANDUM OF OPINION AND ORDER** |
| **Defendants.** | |

This matter comes before the Court upon the Motion for Summary Judgment of Defendants Public Employees Representative Union Local 5 ("PERU") and Jeff Freeman ("Freeman") (collectively, the "Union Defendants"). (Doc. No. 48.) Plaintiff Joseph Caimona ("Caimona") filed a brief in opposition to the Union Defendants' Motion for Summary Judgment on May 29, 2019, to which the Union Defendants replied on June 13, 2019. (Doc. Nos. 53, 54.)

Also, currently pending is the Motion for Summary Judgment of Defendants Ohio Civil Service Employees Association, AFSCME Local 11, AFL-CIO ("OCSEA"), Christopher Mabe ("Mabe"), Buffy Andrews ("Andrews"), and Douglas Sollitto ("Sollitto") (collectively, the "OCSEA Defendants"). (Doc. No. 49.) Caimona filed a brief in opposition to the OCSEA Defendants' Motion for Summary Judgment on May 29, 2019, to which the OCSEA Defendants replied on June 14, 2019. (Doc. Nos. 52, 55.)

For the following reasons, the Union Defendants and the OCSEA Defendants' Motions for Summary Judgment (Doc. Nos. 48, 49) are GRANTED.

## I. Background

### a. Factual Background

#### i. Caimona's Work History at OCSEA

OCSEA is a statewide labor organization that represents public employees in various jobs in local and state government throughout Ohio.  (Doc. No. 49-1 at ¶ 3.)  PERU is a labor union representing the bargaining unit employees of OCSEA.  OCSEA and PERU are parties to a collective bargaining agreement ("CBA"), which sets forth the terms and conditions of employment for PERU's members.  (*Id.* at ¶ 4; Doc. No. 7-1.)  Under the terms of the CBA, PERU "is recognized as the sole and exclusive representative for all regular full-time and part-time employees of [OCSEA] in the classifications of: . . . Staff Representative."  (Doc. No. 7-1 at 3.)

On October 19, 2015, Caimona, an employee of the Ohio Department of Rehabilitation and Correction ("ODRC"), was temporarily assigned to OCSEA as a Project Staff employee under an agreement between OCSEA and the State of Ohio.  (Doc. No. 49-1 at ¶¶ 5-6.)  Under this agreement, Caimona remained employed by ODRC, and the State of Ohio continued to pay his salary and benefits, subject to reimbursement from OCSEA.  (*Id.*)  As Project Staff, Caimona was assigned to work on the AFSCME Strong Campaign, which was an effort focused on updating the list of active union members, increasing union membership, encouraging non-union employees to join and become members, and speaking to members about donating to the union's political action committee.  (Doc. No. 49-3 at ¶ 6.)  The position required Caimona to travel quite extensively throughout Ohio.  (*Id.*)  Although no party specifically addresses the issue, it appears that Caimona lived in Youngstown, Ohio while working for OCSEA.  (*See* Doc. No. 52-1 at ¶ 2.)

While assigned to the AFSCME Strong Campaign, from October 2015 to March 2016, Andrews was Caimona's supervisor. (Doc. No. 49-3 at ¶ 6.) Andrews works as an Operations Director for OCSEA. (*Id.* at ¶ 10.) In that capacity, and among her other duties, Andrews supervises eight Staff Representatives, including Sollitto. (*Id.*) Sollitto was Caimona's co-worker during Caimona's employment at OCSEA and never had any supervisory authority over Caimona. (Doc. No. 49-1 at ¶ 12.) Although Andrews supervises OCSEA employees, she does not have the authority to hire, fire, promote, reassign, or make any decisions that would result in a change of benefits for the OCSEA employees under her supervision. (*Id.* at ¶ 11.)

On March 7, 2016, Caimona was hired as a full-time employee of OCSEA and ended his employment with the State of Ohio. (*Id.* at ¶ 7.) At this time, Caimona was placed under the primary supervision of Timothy Roberts ("Roberts"), OCSEA's Governmental Affairs Director. (*Id.*) As a full-time OCSEA employee, Caimona was assigned numerous duties, including work on the PEOPLE drive, which was focused on identifying current union members, updating union membership cards, meeting with members to ensure they remained committed to the union, and encouraging members to get involved in various forms of political action in support of union causes. (*Id.* at ¶ 8.)

Pursuant to the terms of the CBA, Caimona served a probationary period during his first year of employment with OCSEA, including the time he held his temporary position. (*See* Doc. No. 7-1 at 9-10.) During this probationary period, any discipline or termination of Caimona would not be subject to the grievance procedure contained in the CBA. (*Id.* at 9.) Caimona's probationary period ended on October 19, 2016. (Doc. No. 46 at 70.)

In January 2017, following the retirement of George Yerkes ("Yerkes"), Caimona was assigned to fill Yerkes' position as a Staff Representative, and as a result, came back under the direct supervision of Andrews. (Doc. No. 49-1 at ¶ 14.) Caimona's duties as a Staff Representative included assisting local chapters and their members with contract negotiations, grievances, handling individual member issues and complaints, preparing unfair labor practice charges, and other duties relating to monitoring and enforcing OCSEA's applicable collective bargaining agreements with local and state government employers. (Doc. No. 49-3 at ¶ 11.) Staff Representatives are assigned a geographical area to service, usually work out of their home, and are generally unsupervised. (*Id.*) As such, Staff Representatives are required to submit bi-weekly timesheets documenting and detailing the work they have performed during that period. (*Id.* at ¶ 12.) The timesheets of all Staff Representatives, as well as their monthly expense reports, are reviewed by an Operations Director. (*Id.*) Caimona acknowledged that one of Andrews' jobs was to review timesheets, and he agreed it is important that those timesheets be accurate. (Doc. No. 46 at 188.)

### ii. Caimona's Allegations of Sexual Harassment and Termination

Caimona alleges that "[r]elatively quickly after he went to work with OCSEA in October of 2015, Andrews began attempting to isolate Caimona into awkward social situations and trying to insinuate herself upon him." (Doc. No. 52 at 2; Doc. No. 53 at 2.) Caimona points to numerous incidents, which are discussed below, as evidence of Andrews' inappropriate actions.

According to Caimona, in January 2016, while working in a conference room in OCSEA's office in Columbus, Andrews suggested that Caimona get a hotel room in Columbus for the night instead of driving back to Youngstown. (Doc. No. 46 at 146; Doc. No. 52-1 at ¶ 2.) After Caimona declined to get a hotel room, Andrews came around the table where they were working, and while

leaning over the table to pick something up, deliberately "brushed her breasts" up against him. (Doc. No. 46 at 142-47; Doc. No. 52-1 at ¶ 2.)  Andrews denies that this incident ever occurred. (Doc. No. 49-3 at ¶ 8.)

On February 29, 2016, Andrews assigned Caimona to attend a meeting in Cincinnati, although other employees who lived much closer could have been assigned and the meeting lasted only twenty minutes.  (Doc. No. 52-1 at ¶ 3.)  Andrews suggested that Caimona stay overnight in Cincinnati, but Caimona again refused.  (*Id.*)  Similarly, in early March 2016, Andrews made Caimona travel to Reynoldsburg, a Columbus suburb, for a two-day meeting and recommended he get a hotel room.  (*Id.* at ¶ 4.)  Caimona declined and instead drove home in between the two days. (*Id.*)  During this same time period, Andrews assigned Columbus-area employees to attend meetings in Canfield, an area very close to Caimona, and falsely claimed Caimona had turned down those assignments.  (*Id.*)  On March 30, 2016, Andrews also told Caimona he was going to be assigned work in Westerville, another Columbus suburb, and that it would involve overnight stays. (*Id.* at ¶ 5.)

On March 31, 2016, Andrews saw Caimona walking to dinner after he had checked into his hotel room for the night on a work assignment at Lebanon Correctional Institution.  Andrews suggested he wait, come to her room after she checked in, and then they could get dinner together. (*Id.* at ¶ 6; Doc. No. 46 at 153-54.)  Caimona did not respond and instead continued to dinner by himself.  (Doc. No. 46 at 153-54.)  A couple of months later, on June 15, 2019, Andrews attended a Pick-a-Post meeting to which Caimona and Sollitto had been assigned.  (Doc. No. 52-1 at ¶ 7.) According to Caimona, Sollitto told Caimona to either file an Equal Employment Opportunity ("EEO") complaint or sleep with Andrews so she would leave everyone else alone, as Sollitto had

never seen Andrews attend this type of meeting before and blamed her attendance on Caimona. (*Id.*)  Specifically, Caimona alleges that Sollitto told him to "take one for the team."  (Doc. No. 46 at 32.)

On July 12, 2016, Andrews asked Caimona to meet her at the Holiday Inn in Niles for negotiations with the Trumbull County Engineer's Office.  (*Id.* at 160.)  Caimona refused to attend the negotiations because he was not a lead on the contract negotiating team, and he believed any direct negotiations with the Trumbull County Engineer's Office would be an unfair labor practice because it had hired attorneys to represent it in negotiations.  (*Id.* at 160-61.)  Although the timing is somewhat unclear, at some point in July 2016, Caimona also overheard Andrews demanding that Mabe, the President of OCSEA, "probation remove" Caimona or she would quit her job.  (*Id.* at 17.)

In June or July 2016, Caimona reported Andrews' harassment to Mabe.  (*Id.* at 171; Doc. No. 52-1 at ¶ 9.)  Caimona appears to have met with Mabe at least twice, although the exact timing of these meetings is again unclear.  According to Caimona, Mabe initially said he would take care of the issue, and when the harassment did not stop, assigned Caimona to a job in Columbus working on organizing union cards to get him away from Andrews.  (Doc. No. 46 at 171-75; Doc. No. 52-1 at ¶ 9.)  Caimona also claims that Mabe stated he should have fired Caimona and that he was considering abolishing Caimona's job so that Caimona could not say he was fired.  (Doc. No. 46 at 93.)  However, Mabe asserts that Caimona never told him that Andrews was sexually harassing him.  (Doc. No. 49-2 at ¶ 3.)

In the summer of 2016, Caimona also reported Andrews' harassment to two of PERU's officers, Freeman and Rusty Burkepile ("Burkepile").  (Doc. No. 52-1 at ¶ 12.)  Freeman is the

President of PERU, and Burkepile is the Vice President of PERU. (Doc. No. 48-16 at ¶ 2; Doc. No. 48-17 at ¶ 2.) Both serve on PERU's Executive Board. (Doc. No. 48-16 at ¶ 3; Doc. No. 48-17 at ¶ 3.) Caimona states that they told Caimona there was nothing they could do because he was still serving his probationary period. (Doc No. 52-1 at ¶ 12.) According to Caimona, Freeman and Burkepile called Andrews, Sollitto, and Mabe a "tripod" who would do anything to help each other out. (*Id.*)

On August 8, 12, and 15, 2016, Caimona had meetings at the Trumbull County Engineer's Office, and Andrews asked Caimona to again meet her at the Holiday Inn in Niles regarding these meetings. (Doc. No. 52-1 at ¶ 10.) Caimona refused and instead went directly to the Trumbull County Engineer's Office. (*Id.*) Subsequently, Caimona asked his then-supervisor Roberts to remove him from the negotiating team for that contract, and Roberts acquiesced. (*Id.*) Then, on September 12, 2016, Yerkes asked Caimona to cover an election meeting for him, telling him Andrews had made the request. (*Id.* at ¶ 11.) The next day, Andrews came into the OCSEA offices in Columbus where Caimona was working, accused Caimona of "running around" in her areas, and demanded that Mabe fire Caimona or she would quit her job. (*Id.*)

When Caimona's probationary period ended in mid-October 2016, the harassment stopped for a period of time. (Doc. No. 46 at 38.) However, after Caimona was assigned to take over the Staff Representative position for Yerkes, who was retiring, Sollitto warned Caimona that Andrews would try to get Caimona fired, likely using his timesheets, expense reports, or calendar to do so. (*Id.* at 39.) Subsequently, on January 2, 2019, Andrews told Caimona she was going to Warrensville to help Caimona with two interviews he had to conduct over the next couple of days and suggested that Caimona get a hotel room, but Caimona refused. (Doc. No. 52-1 at ¶ 14.) The

next day, Andrews told Caimona about a former friend who had sex with Andrews' boyfriend. (*Id.* at ¶ 15.) Andrews said she retaliated by having sex with her boyfriend's best friend. (*Id.*) When Caimona commented disapprovingly, she stated that she was single then and could "screw anybody" she wanted, just like she was single now. (Doc. No. 46 at 162.) The following day, Andrews gave Caimona a key to the Warrensville OCSEA office and told him he could go there to use the computer or just hang out like Yerkes used to before he retired. (Doc. No. 52-1 at ¶ 16.) Caimona tried to refuse the key, but Andrews insisted he take it and stated he could go there anytime he wanted to work in private and that he could call her anytime he wanted her to meet him there. (*Id.*)

In early February 2017, Andrews emailed Caimona regarding some concerns she had with one of his timesheets. (Doc. No. 49-3 at ¶ 13.) Caimona responded in an email by telling Andrews that she "needed to stop." (*Id.*) Andrews then wrote that it was her duty to review Caimona's work and indicated that there would be an investigation. (*Id.* at Ex. 1.) Caimona contacted Burkepile regarding his dispute with Andrews and stated that he wanted to file a harassment grievance against her. (Doc. No. 48-16 at ¶¶ 5-7.) Caimona asserts that Freeman and Burkepile refused to file a grievance because of their concern regarding the closeness of Andrews, Mabe, and Sollitto. (Doc. No. 52-1 at ¶ 18.) However, Burkepile and Freeman claim that they met with Andrews on February 7, 2017 to discuss Caimona's timesheet and that they left the meeting believing the situation to have been addressed. (Doc. No. 48-16 at ¶ 8; Doc. No. 48-17 at ¶ 7.) Burkepile had agreed to show Caimona his timesheets in an effort to give Caimona an example on how to complete his own timesheet. (Doc. No. 48-16 at ¶ 8.)

On February 8, 2017, Caimona called off from work due to stress. (Doc. No. 47 at 2.) Caimona then went on short-term disability and ultimately never returned to work. (Doc. No. 46 at 24; Doc. No. 49-1 at ¶ 15.) On April 27, 2017, OCSEA's Human Resources Manager, Sharon Brady ("Brady"), sent Caimona an email asking if he was returning to work on May 1, 2017, as she had been led to believe. (Doc. No. 49-1 at ¶¶ 2, 21-22.) Caimona replied the same day stating he would not be returning to work on May 1, but instead would be off until June 5, 2017. (*Id.* at ¶ 22.) On June 1, 2017, Brady received a letter from Prudential Insurance Company of America ("Prudential"), OCSEA's disability insurance provider, informing her that Caimona's short-term disability benefits had ended effective May 1, 2017. (*Id.* at ¶ 23.) As a result, on June 2, 2017, Brady sent a letter to Caimona via email, as well as certified mail, informing him that he needed to report back to work on Tuesday, June 6, 2017, and that his failure to do so could result in his removal. (*Id.* at ¶ 24.) Caimona then contacted Prudential, who stated that his claim for short-term disability was not closed, but that it was awaiting further information before his claim could be extended past May 1, 2017 and that his physician's request to extend his leave to July 11, 2017 had been forwarded to OCSEA. (Doc. No. 52-1 at ¶ 19.) Caimona also claims that he left a voicemail for Brady stating he would not be back until July 2017. (*Id.*; Doc. No. 46 at 218.) Brady disputes this and asserts that Caimona did not respond to Brady's email or have any further communication with anyone at OCSEA about the status of his employment. (Doc. No. 49-1 at ¶ 25.) After Caimona did not report to work on June 6, 2017, Brady met with OCSEA's Chief of Staff, Kelly Phillips, and they recommended that Caimona be terminated due to his failure to report to work as he was directed, as well as his failure to provide any explanation as to why he was not returning. (*Id.* at ¶¶ 25-26.) Mabe approved their recommendation. (*Id.* at ¶ 26.) In a letter and email dated

June 13, 2017, Brady informed Caimona that his employment with OCSEA had been terminated for those reasons. (*Id.* at ¶ 27.)

On June 16, 2017, Caimona requested that a grievance be filed on his behalf, and Freeman assigned PERU Chief Steward Jennie Lewis ("Lewis") to his grievance. (Doc. No. 48-15 at ¶ 3; Doc. No. 48-17 at ¶¶ 8-9.) A couple days later, on June 19, 2017, Lewis filed a grievance on Caimona's behalf. (Doc. No. 47 at 4; Doc. No. 47-5.) She also contacted Brady and requested all documentation supporting OCSEA's decision to terminate Caimona. (Doc. No. 48-4.) Brady responded on July 5, 2017 with a set of documents, which Lewis reviewed. (Doc. No. 48-5; Doc. No. 48-15 at ¶ 8.) In addition, Freeman requested that Caimona provide Lewis with any evidence he had that would support his "claim of a hostile work place, threats and bullying," but Caimona responded to the request by writing "why are you asking me about the harassment, this grievance is about me being removed from my employment for not returning to work on June 5, 2017." (Doc. No. 47 at 4.) Instead, Caimona's response focused on his argument that OCSEA's Employee Handbook specifies that after being out more than five consecutive days, employees must supply a Return to Work slip from their doctor before they will be permitted to return to work, and Caimona had not been released to return to work by his treating physicians. (Doc. No. 47-1 at 23; Doc. No. 48-6.)

Pursuant to the CBA, a Step 3 hearing on Caimona's grievance took place on July 17, 2017. (Doc. No. 48-15 at ¶ 10.) At the hearing, Lewis argued on Caimona's behalf that his discharge was without just cause in violation of Article 16 of the CBA, that his disability had been extended to July 11, 2017, and that his doctor had explained that fact to Prudential. (*Id.*) However, on July 26, 2017, OCSEA denied Caimona's grievance. (Doc. No. 47-6.)

Subsequently, on August 3, 2017, Lewis met with the PERU Arbitration Committee to discuss Caimona's grievance. (Doc. No. 48-15 at ¶ 12.) The Arbitration Committee is the body empowered to decide whether or not a grievance will be taken to arbitration. (*Id.*) As part of its review, the Arbitration Committee requested additional documentation from Caimona, mainly related to medical information and records during the period he was off from work. (*Id.* at ¶ 13; Doc. No. 48-8.) Caimona replied to the request by stating, "I gave you the last page of my doctor's paperwork that she sent to Prudential showing that she kept me off work, you do not need my medical records for anything." (Doc. No. 48-9.) After receiving Caimona's response, the Arbitration Committee met again telephonically for a final review of the evidence. (Doc. No. 48-15 at ¶ 15.) The Arbitration Committee decided not to pursue arbitration, and on August, 21, 2017, Lewis sent Caimona a letter informing him that "[a]fter careful consideration of the grievance filed on your behalf and the circumstances which gave rise to your termination, the PERU Arbitration Committee has determined that your grievance will not be forwarded to arbitration. . . . It was concluded that the Employer (OCSEA) presented sufficient evidence to warrant the discipline and that PERU could not prevail in arbitration." (Doc. No. 48-10.) Specifically, the Arbitration Committee determined that once Prudential informed OCSEA that Caimona was no longer approved for disability and Caimona failed to return to work, OCSEA could "come to no other conclusion than abandonment of your position." (*Id.*)

On August 31, 2017, Caimona informed Lewis that he wanted to appeal the Arbitration Committee's decision not to forward his grievance to arbitration to the PERU Executive Board, which is a separate entity from the Arbitration Committee. (Doc. No. 48-11; Doc. No. 48-17 at ¶ 4.) On September 21, 2017, Lewis appeared before the PERU Executive Board on Caimona's

appeal and presented the factual background of the case, the Arbitration Committee's decision, and Caimona's appeal. (Doc. No. 48-15 at ¶ 18.) After consideration, the Executive Board elected to uphold the decision of the Arbitration Committee not to proceed to arbitration. (Doc. No. 48-17 at ¶ 15.)

### b. Procedural History

On April 7, 2018, Caimona filed a Complaint in this Court against OCSEA, PERU, Andrews, Sollitto, Mabe, Freeman, and Prudential. (Doc. No. 1.) On July 30, 2018, the previous judge assigned to this case, Judge Benita Pearson, ordered Caimona to show good cause for why the Complaint had not yet been served. (Doc. No. 4.) Thereafter, on August 8, 2018, Caimona filed an Amended Complaint, which he then served on Defendants. (Doc. No. 7.) He also filed a response to the Court's order, asserting that service was delayed because Caimona was suffering from health issues that prevented him from assisting counsel in the timely prosecution and preparation of the case. (Doc. No. 8.)

Caimona's Amended Complaint contains a hostile work environment claim against OCSEA and Andrews, as well as a retaliation claim against OCSEA, under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*. (Doc. No. 7 at 8-10.) Caimona also alleged that OCSEA discharged Caimona without just cause in violation of the CBA and that PERU breached its duty of fair representation when it failed to pursue his grievance to arbitration. (*Id.* at 10-11.) In addition, Caimona asserted the following state-law claims: (1) intentional infliction of emotional distress against all of the Union and OCSEA Defendants, (2) negligent or wrongful hiring, retention, and supervision against OCSEA, (3) negligent failure to prevent sexual harassment against OCSEA, (4) malicious, reckless, and wanton conduct against all of the individual Defendants, and (5) a public

policy claim against all of the Union and OCSEA Defendants. (*Id.* at 11-14.) The only claims in the Amended Complaint related to Prudential were a claim for declaratory judgment and a claim for breach of the covenant of good faith and fair dealing based on Prudential's handling of Caimona's insurance claims. (*Id.* at 14-16.)

On September 18, 2018, the OCSEA Defendants filed a Motion to Dismiss, arguing that dismissal of all claims was warranted based on Caimona's untimely service and that Caimona's claims under Title VII and the Labor Management Relations Act ("LMRA")—i.e., his claims against OCSEA for violation of the CBA and against PERU for breach of its duty of fair representation— were time-barred. (Doc. No. 18.) Prudential also filed a Partial Motion to Dismiss Plaintiff's First Amended Complaint and to Strike the Prayer for Exemplary Damages as to Plaintiff's Claims Against Prudential. (Doc. No. 24.) On December 6, 2018, Judge Pearson denied the OCSEA Defendants' Motion to Dismiss, but granted Prudential's Motion, which narrowed the claims against Prudential to a single claim under 29 U.S.C. § 1132(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"). (Doc. Nos. 32, 33.) Prudential and Caimona later reached a settlement and the Court dismissed Prudential from the case. (Doc. No. 61.)

After conducting discovery, the Union and OCSEA Defendants filed Motions for Summary Judgment on April 30, 2019 and May 1, 2019, respectively. (Doc. Nos. 48, 49.) Caimona filed a brief in opposition to both Motions, and the Union and OCSEA Defendants each filed a reply in support of their respective motions. (Doc. Nos. 52, 53, 54, 55.) As such, both Motions for Summary Judgment are fully briefed and ripe for review.

## II. Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party." *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006). "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is "material" only "if its resolution might affect the outcome of the suit under the governing substantive law." *Henderson*, 469 F.3d at 487.

At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party." *Pittman v. Experian Info. Solutions, Inc.*, 901 F.3d 619, 628 (6th Cir. 2018). In addition, "the moving party bears the initial burden of showing that there is no genuine dispute of material fact." *Ask Chems., LP v. Comput. Packages, Inc.*, 593 F. App'x 506, 508 (6th Cir. 2014). The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." *Lindsey v. Whirlpool Corp.*, 295 F. App'x 758, 764 (6th Cir. 2008). "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial," the moving party may also "meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial." *Ask Chems.*,

593 F. App'x at 508-09. "[T]he nonmoving party may not simply rely on its pleading, but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'" *MISC Berhad v. Advanced Polymer Coatings, Inc.*, 101 F. Supp. 3d 731, 736 (N.D. Ohio 2015) (quoting *Cox*, 53 F.3d at 150).

## III. Analysis

### a. Breach of the Collective Bargaining Agreement and Duty of Fair Representation

Caimona's allegations that OCSEA breached the CBA and that PERU breached its duty of fair representation are treated as "one hybrid case." *Chapman v. United Auto Workers Local 1005*, 670 F.3d 677, 682 (6th Cir. 2012). As the Sixth Circuit has explained:

> The suit against the employer alleges a breach of the collective bargaining agreement under § 301 of the LMRA. The suit against the union alleges breach of the union's duty of fair representation, implied under the scheme of the National Labor Relations Act. The two claims, however, are inextricably interdependent: To prevail against either the company or the Union, [the employee] must not only show that [his] discharge was contrary to the contract but must also carry the burden of demonstrating breach of duty by the Union. The employee must prove both claims to recover from either defendant.

*Id.* (internal quotations and citations omitted). Thus, Caimona must prove both breaches in order to recover against either OCSEA or PERU.[1]

"In order to prove a breach of the duty of fair representation, an employee must demonstrate that the union's actions or omissions during the grievance process were arbitrary, discriminatory, or

---

[1] PERU argues that Caimona's hybrid action is barred by the applicable six-month statute of limitations. (Doc. No. 48 at 16-18.) PERU recognizes that Caimona timely filed suit under the Sixth Circuit's rule, which requires only that the complaint be filed within the six-month limitation period, without regard to whether service occurred within that time frame as well. *Macon v. ITT Cont'l Baking Co., Inc.*, 779 F.2d 1166, 1172 (6th Cir. 1985). However, PERU argues that Caimona's action should be barred based on the particular facts of this case because of the issues with Caimona's service of the Complaint, including Caimona's failure to serve the Complaint within the ninety-day period prescribed by Fed. R. Civ. P. 4(m) and his failure to show good cause for not doing so. Judge Pearson rejected essentially the same argument when she denied the OCSEA Defendants' Motion to Dismiss (*see* Doc. No. 32 at 7-9), and the Court will likewise do so here. Thus, the Court will consider the merits of Caimona's claims.

15

in bad faith." *Garrison v. Cassens Transp. Co.*, 334 F.3d 528, 538 (6th Cir. 2003). "With regard to the arbitrary prong, 'a union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a "wide range of reasonableness" as to be irrational.'" *Id.* (quoting *Air Line Pilots Ass'n Int'l v. O'Neill*, 499 U.S. 65, 67 (1991)). "Any substantive examination of a union's performance, therefore, must be highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities." *O'Neill*, 499 U.S. at 78.

Moreover, while "a union may not arbitrarily ignore a meritorious grievance or process it in perfunctory fashion," there is no absolute right to have a grievance taken to arbitration. *Vaca v. Sipes*, 386 U.S. 171, 191 (1967). Nor is a "breach of the duty of fair representation . . . established merely by proof that the underlying grievance was meritorious." *Id.* at 195. For example, in *Henry v. Murtis H. Taylor Multi-Service Center*, the court found that, regardless of the underlying merits, summary judgment was appropriate when the union granted the plaintiff the opportunity to appeal its decision, analyzed the issues, and "made a reasoned decision not to arbitrate her grievance." No. 1:05cv1598, 2007 WL 81855, at *9 (N.D. Ohio Jan. 8, 2007); *see also White v. Detroit Edison Co.*, 472 F.3d 420, 427 (6th Cir. 2006) ("Czupich and Kulik may have been correct that White's grievance deserved arbitration, and a majority of the Local 223 board may have been wrong. But that does not mean the majority acted arbitrarily or in bad faith, which is what would be required for a reversal under *Vaca*.").

In this case, Caimona cannot establish that PERU breached its duty of fair representation. After Caimona was terminated, PERU assigned Lewis to handle his grievance, and Lewis promptly filed a grievance, conducted an investigation on Caimona's behalf, and presented his case at the grievance hearing. After OCSEA denied Caimona's grievance, Lewis presented Caimona's case to

PERU's Arbitration Committee. The Arbitration Committee thoroughly reviewed his case and even requested additional information from Caimona—which he largely refused to provide—before meeting for a second time to review the evidence. Ultimately, the Arbitration Committee decided not to pursue arbitration because it concluded that OCSEA "presented sufficient evidence to warrant the discipline and that PERU could not prevail in arbitration." (Doc. No. 48-10.) Specifically, the Arbitration Committee found the evidence supported OCSEA's conclusion that Caimona had abandoned his position. PERU's Executive Committee then upheld this decision on appeal. There is no evidence that this process was performed in a perfunctory manner or that PERU processed Caimona's grievance differently than any other employee. PERU also had rational grounds for not proceeding with Caimona's case, as OCSEA presented evidence that Caimona failed to respond to its notice that he had to return to work or risk being terminated. Nor would an examination of the underlying merits of Caimona's doctor's note argument assist Caimona's case, as a breach of the duty of fair representation is "not established merely by proof that the underlying grievance was meritorious." *Vaca*, 386 U.S. at 195.

Caimona argues that summary judgment is inappropriate based on Freeman and Burkepile's previous statements regarding their hesitation to move forward with other grievances on Caimona's behalf because of the "tripod" of Andrews, Sollitto and Mabe. (Doc. No. 53 at 11.) Caimona argues that this evidence establishes PERU simply gave up on the grievance because the position of OCSEA was intractable. (*Id.*) Relying on *Linton v. United Parcel Service*, 15 F.3d 1365 (6th Cir. 1994), Caimona argues that this is insufficient to satisfy PERU's duty of fair representation. However, *Linton* is easily distinguishable. In *Linton*, the union recognized the merits of the plaintiff's grievance, even acknowledging that he had a strong case. *Id.* at 1371. In contrast, there is no evidence

that PERU ever acknowledged the merits of Caimona's grievance or believed that he had a strong case. In addition, the evidence in *Linton* indicated that "the union's decision not to pursue the grievance was based, not on an evaluation of its merits, but on its decision that the company's position, right or wrong, was intractable," *id.* at 1372, whereas here, the Arbitration Committee based its decision on the merits of Caimona's grievance, specifically finding that OCSEA "presented sufficient evidence to warrant the discipline" (Doc. No. 48-10). Finally, the court in *Linton* stated that, "perhaps most importantly, there is evidence that the union had never refused to prosecute an appeal on behalf of an employee in [the plaintiff's] position," and found that "the union's failure to process [the plaintiff's] claim represented an unprecedented departure from past practice." *Id.* at 1373. Here, there is no evidence that PERU treated Caimona differently than other employees or that its decision not to pursue arbitration in this situation differed from past practice.

Moreover, Freeman and Burkepile were not part of the Arbitration Committee, which made the initial decision not to pursue arbitration on Caimona's grievance based on its review of the evidence. Freeman and Burkepile did serve on the Executive Committee. However, there is no evidence that their view of Andrews, Sollitto, and Mabe as a "tripod"—which Burkepile and Freeman allegedly expressed in the context of Caimona's previous complaints about Andrews' behavior— affected the Executive Committee's decision with regard to his grievance for being terminated for failing to return to work. Thus, Caimona has failed to raise a genuine dispute of material fact with respect to whether PERU's actions were arbitrary, discriminatory, or in bad faith. As a result, the Court grants the Union Defendants' Motion for Summary Judgment with respect to Caimona's claim for breach of the duty of fair representation. In addition, because Caimona must prevail against both

PERU and OCSEA to sustain his hybrid action, his claim against OCSEA for its breach of the CBA also fails. *See Henry*, 2007 WL 81855, at *9.

### b. Title VII

#### i. Sexual Harassment

Caimona's Amended Complaint contains a claim against OCSEA and Andrews based on an alleged hostile work environment. (Doc. No. 7 at 8-9.) For the first time in his opposition to the OCSEA Defendants' Motion for Summary Judgment, Caimona characterizes this claim as one of quid pro quo sexual harassment. (Doc. No. 52 at 9.) Thus, the Court will analyze his claim under both theories.[2]

##### 1. Hostile Work Environment

Initially, OCSEA argues that Caimona's hostile work environment claim is time barred because Caimona failed to file his charge of sexual harassment with the Equal Employment Opportunity Commission ("EEOC") within 300 days of the alleged harassment. (Doc. No. 49 at 10-11.) OCSEA acknowledges that in order for the charge to have been timely filed, Caimona need only have filed it within 300 days of any act that is part of the hostile work environment. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117-18 (2002). However, OCSEA asserts that Caimona has not identified any acts of sexual harassment that occurred after October 6, 2016, which is 300 days before the date on which he filed his charge with the EEOC on August 3, 2017. (Doc. No. 7-2.)

---

[2] Caimona's Amended Complaint only referenced Title VII with respect to his sexual harassment claim, but his opposition appears to rely on the Ohio Civil Rights Act, Ohio Rev. Code § 4112. (Doc. No. 52 at 9-11.) Regardless of which statute Caimona is relying upon, the Court's analysis would be the same, as claims under Title VII and the Ohio Civil Rights Act "may be analyzed together . . . because 'Ohio's requirements are the same as under federal law.'" *Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008) (quoting *Carter v. Univ. of Toledo*, 349 F.3d 269, 272 (6th Cir. 2003)); *Lindsey*, 295 F. App'x at 760 n.1 ("The Ohio Civil Rights Act mirrors Title VII in all relevant respects for Plaintiff's discrimination and retaliation claims.")

In support of this assertion, OCSEA claims that Caimona admitted at his deposition that the harassment stopped after his probationary period ended in October 2016 and that he was not subjected to any sexual harassment by Andrews from June 2016 forward. (Doc. No. 49 at 10-11.) But that is not entirely accurate. Caimona admitted that the harassment stopped only for a period of time after his probationary period ended and that he was not subjected to sexual harassment by Andrews from June 2016 only "through the end of the year." (Doc. No. 46 at 38-42, 177.) Caimona testified that Andrews harassed him multiple times after his probationary period ended in January and February 2017 by suggesting he get a hotel room, giving him a key to the Warrensville office, making inappropriate comments about her ex-boyfriend, and criticizing his timesheets—all of which occurred within 300 days of his charge with the EEOC. (*Id.* at 19-20, 158-59, 162-63, 187-88.) As such, the Court finds that Caimona timely filed his charge and will evaluate the merits of his claim.

Title VII "affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult and thus prohibits conduct which is sufficiently severe and pervasive [as] to alter the conditions of the victim's employment and create an abusive working environment." *Lindsey*, 295 F. App'x at 765. To establish a hostile work environment claim, "plaintiffs must prove that: (1) they were members of a protected class; (2) they were subjected to unwelcome harassment; (3) the harassment was based on plaintiffs' protected status; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known about the harassing conduct but failed to take corrective or preventative actions." *Bailey v. USF Holland, Inc.*, 526 F.3d 880, 885 (6th Cir. 2008).

In order to survive summary judgment, plaintiffs "cannot rely on conjecture or conclusory accusations" that they were harassed based on their protected status. *Arendale v. City of Memphis*,

519 F.3d 587, 605 (6th Cir. 2008); *see also Reed v. Procter & Gamble Mfg. Co.*, 556 F. App'x 421, 433 (6th Cir. 2014) (holding several of the plaintiff's allegations failed to meet "the requirement that the harassing behavior be because of [the plaintiff's] race" because "[t]he record is devoid of evidence to indicate that" the harassment occurred "because he is African–American").

Here, except for the one instance when Andrews allegedly brushed her breasts against Caimona and the statements about her ex-boyfriend, Caimona cannot show that any of the alleged harassment by Andrews was based on Caimona's sex. Caimona admitted at his deposition that Andrews never said anything to him directly or indirectly indicating she had any sexual interest in him, never kissed him or tried to do so, never told Caimona that she wanted to have a sexual relationship with him, never sent him any text messages, emails, photographs, letters, notes, or cards indicating she wanted to have a sexual relationship with him, never made any sexual propositions to him, never made any sexually suggestive comments to him about the two of them getting together, and never engaged in any teasing, kidding, or practical jokes with Caimona of a sexual nature. (Doc. No. 46 at 152, 157-58, 163.) Caimona's only evidence in support of his sexual harassment claim is his own belief that Andrews made "numerous advances that Caimona reasonably determined were sexual in nature" (Doc. No. 52 at 10), Sollitto's statement that he should "take one for the team"—which is likewise conjecture—and the fact that Andrews demanded he be fired after he allegedly spurned her advances. This is insufficient to establish that the vast majority of Andrews' harassment was based on his sex. Andrews' suggestions that he get a hotel room when he was traveling hours away from his home, which his job often required, are not inherently sexual. Similarly, the fact that Andrews assigned him tasks in different parts of Ohio, critiqued his timesheets, and gave him a key to one of OCSEA's offices simply appear to be part of the job and of her supervision over him.

Moreover, the only time she demanded that he be fired shortly after he refused to meet her at a hotel was after he refused to meet her in Niles for a contract negotiation, which he believed was a fake request because he unilaterally concluded it would have been an unfair labor practice. In sum, there is simply not enough evidence to raise a genuine dispute of fact regarding whether almost all of Andrews' harassment of Caimona was because of his sex, rather than simply her acting as his supervisor.

The only acts Caimona has identified that could potentially be based on his sex are when Andrews allegedly brushed her breasts against Caimona and her statements about her ex-boyfriend. However, even assuming that this conduct was based on Caimona' sex, it was not sufficiently severe or pervasive for Caimona's hostile work environment claim to survive summary judgment. For alleged harassment to be actionable, "[t]he conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive." *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997). "To determine whether an environment is sufficiently hostile or abusive, a court must consider 'all of the circumstances,' including the 'frequency of the discriminatory conduct, its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Lindsey*, 295 F. App'x at 766 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). The harassment "must be extreme to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* (internal quotations and citations omitted).

To illustrate, in *Cecil v. Louisville Water Co.*, a female plaintiff asserted that her male supervisor made numerous inappropriate comments, including comments that she "dressed too nicely, wanted to play in the dirt, and reminded him of Lisa Douglas [a character in a television show whom many perceived to be dim-witted]" and that certain work locations were "no place for a lady." 301 F. App'x 490, 493, 499 (6th Cir. 2008). He also humiliated her in meetings when she requested help and monitored her and other females more closely than male employees. *Id.* In addition, a male human resources officer called her "easy" and told other male employees to circulate that information. *Id.* at 493. Nonetheless, the Sixth Circuit agreed with the district court that the alleged harassment was not "severe and pervasive" because "[t]he comments, while admittedly inappropriate, appear to have been isolated incidents" and the plaintiff did "not present[] evidence indicating that any of the alleged incidents of harassment interfered with her work performance." *Id.* at 500.

Similarly, in *Clay v. United Parcel Service, Inc.*, the Sixth Circuit held that fifteen specific incidents of racially-motivated harassment spanning a two-year period, including the refusal to remove the plaintiff from a position that required heavy lifting that resulted in a groin injury to the plaintiff, were not sufficiently severe and pervasive to be actionable. 501 F.3d 695, 707-08 (6th Cir. 2007); *see also Morris v. Oldham Cty. Fiscal Court*, 201 F.3d 784, 790 (6th Cir. 2000) (affirming summary judgment for the defendant even though the female plaintiff asserted that her male supervisor implied he would improve her performance evaluation in exchange for sexual favors, told several dirty jokes in her presence, called her "hot lips," and commented on multiple occasions about her state of dress). As these cases show, the Sixth Circuit "has established a relatively high bar for what amounts to actionable discriminatory conduct under a hostile work environment theory." *Phillips v. UAW Int'l*, 854 F.3d 323, 328 (6th Cir. 2017).

Andrews' alleged harassment of Caimona has not met this bar. One inappropriate touching and one inappropriate comment over approximately one and a half years of employment is not severe or pervasive enough to be actionable. Consequently, OCSEA and Andrews are entitled to summary judgment on Caimona's hostile work environment claim.

## 2. Quid Pro Quo

"To prevail on a *quid pro quo* claim of sexual harassment, a plaintiff must assert and prove (1) that the employee was a member of a protected class; (2) that the employee was subjected to unwelcomed sexual harassment in the form of sexual advances or requests for sexual favors; (3) that the harassment complained of was based on sex; (4) that the employee's submission to the unwelcomed advances was an express or implied condition for receiving job benefits or that the employee's refusal to submit to a supervisor's sexual demands resulted in a tangible job detriment; and (5) the existence of respondeat superior liability." *Highlander v. K.F.C. Nat. Management Co.*, 805 F.2d 644, 648 (6th Cir. 1986). "To demonstrate a request for sexual favor or sexual advance, a plaintiff must present 'some evidence that, from an objective perspective, the alleged conduct carried with it an express or implied request for sexual favors in return for some action affecting the plaintiff's terms or conditions of employment.'" *Gorbett v. OS Restaurant Services, Inc.*, No. 1:07 CV 2448, 2009 WL 10717142, at *10 (N.D. Ohio July 10, 2009) (quoting *Thomas v. Henderson*, 44 F. Supp. 2d 915, 926 (E.D. Mich. 1999)).

Based on the same reasoning discussed above, Caimona has failed to present sufficient evidence that, from an objective perspective, Andrews made an express or implied request for sexual favors in return for some action affecting Caimona's terms or conditions of employment. Indeed, Caimona specifically admitted that Andrews never made any sexual propositions to him or made any

sexually suggestive comments about the two of them getting together. (Doc. No. 46 at 152, 157-58, 163.) His beliefs or perceptions about her conduct are simply not enough to raise a genuine issue of material fact. *See Gorbett*, 2009 WL 10717142, at *10 (granting summary judgment because plaintiff's statement that she believed she was fired for not having sex with her superior was "mere speculation, and Plaintiff fails to direct the court to credible evidence that Jaffray ever requested that she have sex with him or otherwise made that a condition of her employment"). As such, the Court grants summary judgment in favor of OCSEA and Andrews on Caimona's quid pro quo sexual harassment claim.[3]

### ii. Retaliation

Caimona's Amended Complaint contains a claim against OCSEA for retaliation under Title VII. (Doc. No. 7 at 9-10.) However, Caimona failed to respond to OCSEA's arguments in its Motion for Summary Judgment regarding Caimona's retaliation claim. As such, the Court finds that Caimona has abandoned his claim and summary judgment in favor of OCSEA is thus appropriate. As the Sixth Circuit has recognized, its "jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013); *see also Wierengo v. Akal Sec., Inc.*, 580 F. App'x 364, 369 n.1 (6th Cir. 2014) ("Akal moved for summary judgment on Wierengo's federal-and-state-law claims. Wierengo did not discuss her state-law claims in her response brief, and the district court held that they were abandoned. We agree."); *Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011) ("The district court properly declined

---

[3] Because the Court finds that both of Caimona's sexual harassment claims fail on the merits, the Court need not address Andrews' argument that she could not be held individually liable on these claims. (*See* Doc. No. 49 at 13.)

to consider the merits of this claim because Hicks failed to address it in either his response to the summary judgment motion or his response to Concorde's reply brief.").

Moreover, even considering the merits of Caimona's claim, the Court agrees with OCSEA that Caimona has failed to establish a prima facie case of retaliation. (Doc. No. 49 at 13-15.) In the absence of direct evidence of retaliation, the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies. *See Taylor v. Geithner*, 703 F.3d 328, 336 (6th Cir. 2013). "Under this framework, the plaintiff bears the initial burden to establish a prima facie case of retaliation." *Goodsite v. Norfolk S. Ry. Co.*, 573 F. App'x 572, 582 (6th Cir. 2014). "To establish a prima facie case of retaliation under Title VII, the plaintiff must demonstrate that: (1) she engaged in activity protected by Title VII; (2) the defendants knew of her protected activity; (3) thereafter, the defendants took 'materially adverse' actions against the plaintiff; and (4) the protected conduct was a but-for cause of the adverse action." *Id.*

Based on Caimona's Amended Complaint, he appears to allege that Andrews' additional scrutiny of him and his termination were in retaliation for his complaint to Mabe about Andrews' sexual harassment. (Doc. No. 7 at 9-10.) To the extent that Caimona is attempting to rely on any of Andrews' alleged harassment to support his claim of retaliation, his claim fails because there is no evidence that Andrews was ever aware of Caimona's complaint about her sexual harassment. To the extent that Caimona alleges his termination was in retaliation for his protected activity, his claim fails because he has not introduced any evidence connecting his complaint to Mabe in June or July 2016 to his termination a year later for failing to report to work. Thus, OCSEA's Motion for Summary Judgment is granted with respect to Caimona's retaliation claim.

### c. State-Law Claims

Both the Union and OCSEA Defendants assert that they are also entitled to summary judgment on Caimona's state-law claims because Caimona abandoned them, as he failed to respond to any of their arguments regarding those claims. (Doc. No. 54 at 2; Doc. No. 55 at 8-9.) The Court agrees with Defendants.

Caimona did not respond to any of Defendants' arguments regarding his state-law claims. Indeed, Caimona did not even mention these claims in either of his briefs and specifically requested that the Court deny summary judgment only with respect to his claims for breach of the duty of fair representation, breach of contract, and gender discrimination. (Doc. No. 52 at 1, 13; Doc. No. 53 at 1, 11.) Consequently, the Court finds that Caimona has abandoned his state-law claims, and summary judgment in favor of the Union and OCSEA Defendants on such claims is appropriate. Moreover, even considering the merits of these claims, summary judgment is warranted, as discussed below.

### i. Intentional Infliction of Emotional Distress

Caimona's Amended Complaint asserts an intentional infliction of emotional distress claim against all Defendants. (Doc. No. 7 at 11-12.) In response, Defendants assert that Caimona's claim is preempted. (Doc. No. 48 at 18-19; Doc. No. 49 at 17.) The OCSEA Defendants also argue that Caimona has not identified sufficiently extreme behavior to survive summary judgment even if the claim is not preempted. (Doc. No. 49 at 17-18.) The Court finds both arguments persuasive.

The Sixth Circuit has delineated a two-step inquiry to determine whether a state-law claim is sufficiently independent to survive preemption by § 301 of the LMRA. *Mattis v. Massman*, 355 F.3d 902, 906 (6th Cir. 2004). "First, courts must determine whether resolving the state-law claim would require interpretation of the terms of the collective bargaining agreement." *Id.* "Second, courts must

ascertain whether the rights claimed by the plaintiff were created by the collective bargaining agreement, or instead by state law." *Id.* If interpretation of the collective bargaining agreement is required *or* the rights claimed by the plaintiff were created by the collective bargaining agreement, then the claim is preempted. *Id.* "In short, if a state-law claim fails either of these two requirements, it is preempted by § 301." *Id.*

In Ohio, intentional infliction of emotional distress occurs when "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another." *Colina v. McGraw Constr. Co.*, 590 N.E.2d 1308, 1310 (Ohio Ct. App. 12th Dist. 1990) (quoting *Yeager v. Local Union 20*, 6 Ohio St.3d 369, 374 (1983)). Multiple courts have found such claims preempted by § 301. For example, in *Mattis*, the Sixth Circuit held that the plaintiff's intentional infliction of emotional distress claim against his supervisor for repeated harassment was preempted. 355 F.3d at 908. The court noted that "a defendant has not acted outrageously where he has done no more than to insist upon his legal rights in a permissible way." *Id.* (quoting *DeCoe v. Gen. Motors Corp.*, 32 F.3d 212, 219 (6th Cir.1994)). As a result, the court held that "determining whether Massman's alleged harassment constituted 'outrageous conduct' would force us to look to the CBA" because "[w]ithout reference to the CBA, we could not possibly know whether Massman acted outrageously or was merely insisting on his legal rights as a supervisor." *Id.*; *see also DeCoe*, 32 F.3d at 220 ("[R]eference must be made to the CBA in order to determine whether the defendants acted outrageously, or whether they merely pursued their legal rights in a permissible way.") (internal quotations and citations omitted).

Similarly, the Court would be required to interpret the CBA to determine whether any of the Defendants have acted outrageously. With regard to the Union Defendants, Caimona specifically

admitted that all of the alleged actions attributed to Freeman were committed in his capacity as the President of PERU. (Doc. No. 46 at 117.) Similarly, almost all of the alleged harassment by Andrews and the other OCSEA Defendants consisted of actions taken in their roles as OCSEA employees, such as Andrews assignment of Caimona to various tasks and her comments on his timesheets. Judging the appropriateness of these actions would require interpreting various provisions of the CBA, such as Article 2—which gives OCSEA the exclusive right to "[d]irect, supervise, evaluate or hire employees," "transfer, assign, schedule, promote or retain employees," and "[e]ffectively manage the work force"—and Article 11—which governs employee grievances. (Doc. No. 7-1 at 1-2, 8-9.) Accordingly, Caimona's intentional infliction of emotional distress claims are preempted.

Moreover, the Court agrees with the OCSEA Defendants that, alternatively, summary judgment is appropriate because Caimona has failed to present evidence of any sufficiently outrageous conduct. *See Colina*, 590 N.E.2d at 1310 ("Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.") (quoting *Yeager*, 6 Ohio St.3d at 374-75).

### ii.  Negligent or Wrongful Hiring, Retention, and Supervision

Caimona brings his claim for negligent or wrongful hiring, retention, and supervision solely against OCSEA. (Doc. No. 7 at 12-13.) Under Ohio law, to prove an action for negligent hiring or retention, the plaintiff must establish "(1) the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employee's act or omission causing the plaintiff's injuries; and (5) the employer's negligence in hiring or retaining the employee as the proximate cause of plaintiff's

injuries." *Evans v. Ohio State Univ.*, 680 N.E.2d 161, 171 (Ohio Ct. App. 10th Dist. 1996). Caimona has not presented any evidence establishing that Andrews was incompetent or that OCSEA was negligent either in hiring her or retaining her as an employee. Therefore, summary judgment in OCSEA's favor is warranted.

### iii. Negligent Failure to Prevent Sexual Harassment

Caimona also brings his negligent failure to prevent sexual harassment claim solely against OCSEA. (Doc. No. 7 at 13.) Courts have determined that "Ohio law recognizes a cause of action for negligent failure to provide a safe work environment in the sexual harassment context." *Griswold v. Fresenius USA, Inc.*, 978 F. Supp. 718, 734 (N.D. Ohio 1997). "[A] claim of negligence against an employer exists 'if the employer, in the exercise of reasonable care, should have known of an employee's reputation for sexual harassment and that it was foreseeable that the employee would engage in sexual harassment of a fellow employee but he was continued in his employment.'" *Braun v. Ultimate Jetcharters, Inc.*, No. 5:12–cv–01635, 2013 WL 3873238, at *20 (N.D. Ohio July 25, 2013) (quoting *Griswold*, 978 F. Supp. at 734). Here, there is no evidence that Andrews had a reputation for sexual harassment or that it was foreseeable that she would engage in sexual harassment. Indeed, Andrews has not been the subject of any other sexual harassment complaints during her employment at OCSEA or her over eighteen years of employment in other positions both in and out of state government. (Doc. No. 49-1 at ¶ 11; Doc. No. 49-3 at ¶ 16.) Thus, OCSEA is entitled to summary judgment on Caimona's negligence claim. Moreover, because Caimona has failed to establish he was subject to sexual harassment, as discussed above, his claim based on OCSEA's failure to provide a safe work environment free from sexual harassment necessarily fails as well. *See Braun*, 2013 WL 3873238, at *20.

### iv. Malicious, Reckless, and Wanton Conduct

In his Amended Complaint, Caimona included a claim against all of the individual Defendants for malicious, reckless, and wanton conduct. (Doc. No. 7 at 13.) However, under Ohio law, "[w]illful, wanton, and reckless conduct is technically not a separate cause of action, but a level of intent which negates certain defenses which might be available in an ordinary negligence action." *Brown v. Whirlpool Corp.*, 996 F. Supp. 2d 623, 643 (N.D. Ohio 2014) (quoting *Cincinnati Ins. Co. v. Oancea*, No. L–04–1050, 2004 WL 1810347, at \*3 (Ohio Ct. App. 6th Dist. Aug. 13, 2004). Consequently, to the extent Caimona purports to bring a separate claim for the individual Defendants' malicious, reckless, and wanton conduct, the individual Defendants are entitled to summary judgment.

### v. Public Policy

Finally, Caimona included a claim labeled "Public Policy" in his Amended Complaint, which alleged that Defendants conduct "was in retaliation to Plaintiff alerting his superiors of the illegal activities of Defendant Douglas Sollito and others." (Doc. No. 7 at 13-14.) The Union Defendants interpreted this as a claim under the Ohio Whistleblowers' Protection Act (Doc. No. 48 at 19), while the OCSEA Defendants interpreted it as a claim pursuant to Ohio's exception to the employment at will doctrine for employees terminated in violation of a recognized public policy (Doc. No. 49 at 19-20). Regardless of how Caimona's claim is interpreted, however, all Defendants are entitled to summary judgment, as Caimona has failed to submit any evidence in support of his claim and may not rely on the allegations in his Amended Complaint at the summary judgment stage. *See MISC Berhad*, 101 F. Supp. 3d at 736.

## IV.     Conclusion

For the reasons set forth above, the Union Defendants and the OCSEA Defendants' Motions for Summary Judgment (Doc. Nos. 48, 49) are GRANTED.

**IT IS SO ORDERED.**

           *s/Pamela A. Barker*
PAMELA A. BARKER
Date:  December 3, 2019          U. S. DISTRICT JUDGE